IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GARDNER DENVER, INC., <br><br> Plaintiff, <br><br> v. <br><br> ARCH INSURANCE COMPANY et al., <br><br> Defendants. | CIVIL ACTION <br> NO. 16-0159 |

**OPINION**

**Slomsky, J.**                                                                                  **December 16, 2016**

## I.      INTRODUCTION

The matter before the Court arises from an insurance policy dispute between Plaintiff, Gardner Denver, Inc. ("GDI") and Defendants Arch Insurance Company ("Arch"), Continental Casualty Company ("CNA"), and Federal Insurance Company ("Federal"). Plaintiff alleges that the policies in issue (the "Policies") were sold by Defendants to Plaintiff to protect it from lawsuits arising from mergers and acquisitions. Since Plaintiff was acquired by another entity, Plaintiff submits that coverage under the Policies was triggered. (Doc. No. 22 at 2.) Defendants contest the claim for coverage.

In July 2013, Kohlberg, Kravis & Roberts ("KKR") acquired Plaintiff. (Doc. No. 3 at 6.) As a result of the acquisition, several of Plaintiff's shareholders filed suits against Plaintiff. (Id.) Thereafter, Plaintiff entered into a settlement agreement with the shareholders. (Id. at 7-8.) Because Plaintiff was obligated to pay money as part of the settlement, Plaintiff sought coverage from Defendants under the Polices. (Id.)   After review of the claims, Defendants denied coverage for the settlement. (Id. at 8.)

On January 14, 2016, Plaintiff commenced this action seeking coverage of the settlement under the Polices. (Id. at 9.) On February 10, 2016, Plaintiff filed the First Amended Complaint (Doc. No. 3) to which Defendant Arch Insurance responded with a Motion to Dismiss (Doc. No. 16), and Defendants Federal Insurance Company and Continental Casualty Company responded with a joint Motion to Dismiss (Doc. No. 18). These Motions are now ripe for review.[1] For reasons discussed below, the Court will deny the Defendants' Motions on Counts II and IV, and reserve a decision on Count III.

## II.   FACTUAL BACKGROUND

Plaintiff is a global provider of industrial equipment, technologies, and services. (Doc. No. 3 ¶ 10.) It has grown through strategic acquisitions of other entities. (Id.) Like most companies, Plaintiff has regularly purchased directors and officers ("D&O") insurance to protect itself and its directors and officers. (Id. at 2.) In order to be protected from the risk of shareholder claims, Plaintiff purchased D&O insurance that included broad coverage for alleged wrongful acts of Plaintiff's directors and officers. (Id. at ¶ 13.) As alleged in the First Amended Complaint, "Specifically, the D&O insurance that [Plaintiff] purchased covered [Mergers & Acquisition] claims, unless otherwise specifically excluded." (Id.)

Plaintiff had D&O insurance and coverage for shareholder litigation in place for years before the July 2013 acquisition by KKR and the resulting litigation by shareholders ("underlying shareholder litigation"). (Id.) Each Defendant sold D&O policies to Plaintiff prior to its acquisition by KKR and the underlying shareholder litigation. (Id.)

---

[1] The parties have stipulated that Count I seeking a Declaratory Judgment be dismissed with prejudice. (Doc. No. 29.) This Opinion will address Count II: Breach of Contract, Count III: Reformation, and Count IV: Fraud in the Execution. (See Id.)

To properly frame the legal issues that arise in this litigation, it is necessary to chronologically review the history and critical provisions of these insurance policies and those that followed, all of which covered Plaintiff from September 2004 through September 2013.[2] In addition, the Court will describe the acquisition, underlying shareholder litigation, and coverage denial that led to the present action.

### A. Underlying Shareholder Litigation and Coverage Denial

From February 2013 to July 2013, Kohlberg, Kravis & Roberts' ("KKR") negotiated with and eventually acquired Plaintiff. (Doc. No. 3 at 6.) In July 2013, several of Plaintiff's shareholders challenged the acquisition by filing three putative class actions in the Delaware Court of Chancery[3] and one action in the Court of Common Pleas in Chester County, Pennsylvania.[4] (Doc. No. 3 at 6-7.)

The four actions asserted identical claims alleging breach of duties by Plaintiff's former directors and officers, and derivative claims against KKR for allegedly aiding and abetting Plaintiff's directors and officers in their breach of duties. (Id. at 7.) After mediation in June 2014, Plaintiff and the shareholders settled the litigation for $30 million, which included $1 million in attorneys' fees. (Id.) The settlement also afforded counsel for the shareholders the

---

[2] "As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings. However, an exception to the general rule is that a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) (citation and quotations omitted). Here, the insurance policies are integral and explicitly relied upon in the First Amended Complaint. Therefore, the Court has considered the language of the Policies in deciding the Motions to Dismiss.

[3] The class actions were consolidated under the caption In re Gardner Denver, Inc. Shareholder Litigation, No. 8505-VCN.

[4] The individual shareholder action was stayed pending the outcome of the consolidated action.

opportunity to receive an additional award of attorneys' fees out of the principal payment of $29 million. (Doc. No. 22 at 6.)

After the settlement, Plaintiff applied for reimbursement under the Polices in force from September 30, 2012 to September 30, 2013. (Doc. No. 3 at ¶ 45.) More specifically, Plaintiff sought coverage under the following polices:

> Arch policy number DOP0040675092, which provided $10,000,000 in coverage ("Arch Policy"); CNA policy number 425222022, which provided an additional $10,000,000 in first-level excess coverage ("CNA Policy"); and Federal policy number 8147-7908, which provided $10,000,000 in second-level excess coverage ("Federal Policy"). By their terms, the CNA Policy and the Federal Policy incorporate the relevant terms of the Arch Policy.

(Id. at ¶ 46.)

Defendants denied insurance coverage for the settlement. (Doc. No. 3 at 22.) Defendants argue that the Policies expressly exclude coverage of claims arising from the acquisition of Plaintiff, which occurred when KKR acquired Plaintiff in July of 2013. (Doc. Nos. 16 at 1; 18 at 8.) Accordingly, Defendants assert the settlement in the underlying litigation following acquisition of Plaintiff was not a covered event. (Doc. Nos. 16 at 1-2; 18 at 8.)

**B. Plaintiff's Insurance Coverage from September 2004 to September 2010**

    **i. Defendants' Coverage of Plaintiff from September 2004 to September 2010**

From September 2004 to September 2010, Arch provided excess D&O coverage that "followed form"[5] to Plaintiff's primary coverage. (Id. at ¶ 55.) From September 2006 until September 2010, Federal provided excess D&O coverage that followed form to Plaintiff's

---

[5] "Followed form" means the excess polices followed the terms and conditions of a primary policy. (Doc. No. 3 at ¶ 55.) Between September 2004 and 2010, an affiliate of the St. Paul Travelers Companies, Inc. issued the primary coverage to which Defendants Arch and Federal followed form. (Id. at ¶ 58.)

primary coverage. (Id. at ¶ 56.) Regarding CNA, the third defendant, it is alleged that "CNA sold high-level excess D&O coverage to [Plaintiff] for two years during this period, . . . only for the benefit of [Plaintiff's] individual directors and officers." (Id. at ¶ 57.) Plaintiff argues that all of these policies covered M&A claims that arose from an acquisition of Plaintiff, like those in the shareholder litigation, and that these policies excluded coverage only for claims that arose from acquisitions by Plaintiff. (Id. at ¶ 59.)

### ii. Plaintiff's Primary Coverage from September 2004 to September 2010

From September 2004 until September 2010, Plaintiff's primary insurance coverage was obtained from an affiliate of the St. Paul Travelers Companies, Inc. ("Travelers"), with excess insurance coverage provided by Defendants as noted above. (Doc. No. 3 at 11.) Travelers' 2009-2010 primary policy, to which Defendants Arch and Federal followed form, had a bump-up exclusion that barred coverage only for claims:

> based upon . . . the actual or proposed payment by the Company [referring to Plaintiff, also known as GDI] of allegedly inadequate consideration in connection with the Company's [GDI's] purchase of securities issued by any Company, provided however that this exclusion shall not apply to Defense Costs.

(Doc. No. 3 at ¶ 62.) This bump-up exclusion barred coverage for claims related to Plaintiff's purchase of another entity.[6] (Id.)

This quoted exclusion in the Travelers, Arch, and Federal polices had an exception to the exclusion. (Id. at ¶ 63.) The exception allowed insurance coverage for claims against directors

---

[6] The prior CNA excess policy had a bump-up exclusion that is similar to the Travelers, Arch and Federal exclusion. The CNA policy excluded:

> any amount that represents or is substantially equivalent to an increase in the consideration paid or proposed to be paid by the Company [GDI] or any [GDI] Subsidiary in connection with its purchase of any securities or assets.

(Doc. No. 3 at ¶ 64.)

5

and officers, as opposed to claims against Plaintiff itself, arising from Plaintiff's acquisition of another entity ("Side A Coverage"). (Id.) This coverage expired in September 2010. (Id. at 12.)

### C. Defendants' Coverage of Plaintiff From September 2010 to September 2012

Before Plaintiff's coverage expired in September 2010, Plaintiff worked with two different insurance brokers to find D&O coverage for the period of September 2010 to September 2011. (Doc. No. 3 at ¶ 66-67.) Plaintiff sought coverage at least as broad as the expiring coverage. (Id. at ¶ 66.) Plaintiff claims "Arch offered to sell a primary D&O policy that provided coverage at least as broad as the expiring policies, except as to any provisions where Arch and [Plaintiff] agreed to the contrary." (Id. at ¶ 69.) "As proposed 'follow form' excess insurers, CNA and Federal offered to match Arch's offer, on an excess basis." (Id. at ¶ 70.)

Thereafter, Plaintiff selected Arch as its new primary insurer. (Id. at ¶ 73.) Plaintiff decided to continue using Federal as one of its excess D&O insurers. (Id. at ¶ 75.) Plaintiff also decided to resume using CNA as an excess D&O insurer, which had not insured Plaintiff since the 2007-2008 policy period. (Id. at ¶ 76.)

As a result of these events, Plaintiff asserts that it believed it would receive coverage at least as broad as the coverage provided by the expiring Travelers, Arch, and Federal policies, except as otherwise specifically agreed to. (Id.) Plaintiff also believed there would be continued coverage that would apply to claims that arise from acquisitions of Plaintiff, like the underlying shareholder litigation, and the bump-up provisions going forward would continue to exclude only claims arising from acquisitions by Plaintiff. (Id.)

The new Polices continued to cover M&A claims. (Doc. No. 22 at 10.) The Policies specifically insured "M&A Related Securities Claims," and provided a "separate self-insured

retention ("SIR") for such claims." (Id.)  Defendants agreed to pay a covered "Loss" (up to applicable Policy limits) on behalf of Plaintiff's directors and officers, and similarly the Corporation.[7]  (Doc. Nos. 16 at 3; 18 at 5-6.)  In the Arch Policy, "Loss" is defined as "damages, settlements, judgments (including awards of legal fees and costs, pre/post-judgment interest, and Defense Costs."  (Doc. Nos. 16-1 at 2 of 7; 18 at 6.)

The language of the bump-up exclusion[8] to "Loss" in this Policy was set forth in an "Endorsement" which excluded any:

> (5) amount representing, or substantially equivalent to, an increase in consideration paid or proposed to be paid in connection with any purchase of securities or assets of a Corporation or any plaintiffs' counsel fees in any Claim alleging inadequate or unfair consideration . . . .

(Doc. No. 16-1 at 3 of 7.)  Arch's Policy also included an integration clause which meant that the Arch Policy is the "embodiment of all agreements between the parties . . . ." (Doc. No. 16 at 4.)

---

[7] The Arch Policy defines "Corporation" as "the Named Corporation and any Subsidiary thereof, including any such organization as a debtor-in-possession under the United States bankruptcy law or an equivalent status under the law of any other country." (Doc. No. 16-1 at 2 of 14.) "'Named Corporation' means the company designated in Item 1 of the Declarations. (Doc. No. 18 at 6.)  Plaintiff is the Named Corporation designated in Item 1 of the Declarations (Id.)

[8] Plaintiff notes that Defendants "removed the broader bump-up exclusion that they originally planned for these going-forward polices and replaced it with a narrower bump-up exclusion that more closely tracked the language of the expiring bump-up exclusion" from Travelers, which is quoted above. (Doc. No. 22 at 10.)  Plaintiff argues the original version of the bump-up exclusion from the Arch primary policy excluded coverage for both acquisitions by Plaintiff and acquisitions of Plaintiff:

> . . . any amount that represents or is substantially equivalent to an increase in the consideration paid or proposed to be paid in connection with any purchase of any securities or assets, or any plaintiffs' counsel fees and expenses in any Claim seeking such increase in consideration . . . .

(Doc. No. 22 at 11.)  This language was replaced in the Arch Policy by the language that Plaintiff contends covered its acquisition. (Id.)

7

**D. Defendants' Coverage of Plaintiff From September 2012 to September 2013**

Before renewing the primary coverage for the period September 2012 to September 2013 (the period at issue in this case), Arch had been concerned about a potential acquisition of Plaintiff. (Doc. No. 22 at 12.) This concern arose because by July 2012, Plaintiff's CEO had resigned which led to a drop in Plaintiff's stock price. (Id.) Arch therefore took two measures to protect itself against any shareholder claims arising from an acquisition of Plaintiff: (1) Arch imposed an 8% increase in premiums, and (2) Arch raised Plaintiff's self-insured retention amount ("SIR") for M&A claims from $500,000 to $2,000,000, memorialized in the M&A Related Securities Claims Endorsement to the Arch Policy. (Id.) Federal also increased Plaintiff's premiums before renewing the excess policy for the same time period. (Id.) According to Plaintiff, Defendants did not broaden the bump-up exclusion in these policies. (Id.)

### III. STANDARD OF REVIEW

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) is set forth in Ashcroft v. Iqbal, 556 U.S. 662 (2009). After Iqbal it is clear that "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice" to defeat a Rule 12(b)(6) motion to dismiss. Id. at 663; see also Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ethypharm S.A. France v. Abbott Labs., 707 F.3d 223, 231 n.14 (3d Cir. 2013) (citing Sheridan v. NGK Metals Corp., 609 F.3d 239, 262 n.27 (3d Cir. 2010)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Applying the principles of Iqbal and Twombly, the Third Circuit in Santiago v. Warminster Twp., 629 F.3d 121 (3d Cir. 2010), set forth a three-part

analysis that a district court in this Circuit must conduct in evaluating whether allegations in a complaint survive a 12(b)(6) motion to dismiss:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

Id. at 130 (quoting Iqbal, 556 U.S. at 675, 679). "This means that our inquiry is normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

A complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts. Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (citing Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'shown' — 'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679. The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

### IV.   ANALYSIS

#### A.   Breach of Contract

Read in the light most favorable to Plaintiff, the First Amended Complaint sets forth a plausible claim for relief for breach of contract. The pertinent Arch Policy, covering the period September 2012 to September 2013, contains language, to which Federal and CNA followed form, that is ambiguous. For this reason, and considering the course of events between Plaintiff

and Defendants regarding the D&O coverage, which can be taken into account in the circumstances of the instant insurance coverage dispute, Plaintiff has shown a reasonable expectation for believing that there would be coverage for the settlement in the underlying shareholder litigation.

Defendants claim that Count II of the First Amended Complaint—Breach of Contract—should be dismissed because the policies "unambiguously exclude coverage for [Plaintiff's] Settlement." (Doc. No. 16 at 8; See Doc. No. 18 at 8-11.) The Third Circuit Court of Appeals has articulated the standard to follow when interpreting insurance contracts under Pennsylvania law:

> Under Pennsylvania law, an insurance contract is governed by the law of the state in which the contract was made. In Pennsylvania, the fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties. Where writing is clear and unequivocal, the intent of the parties is found in the writing itself. A contract contains an ambiguity if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. Specifically, insurance contracts must be interpreted in light of the insured's reasonable expectations. If an ambiguity is otherwise unresolvable, inferences should be drawn against the insurance company, the author of the policy.

Indian Harbor Ins. Co. v. F & M Equipment, Ltd., 804 F.3d 310, 313 (3d Cir. 2015) (internal quotations and citations omitted).[9] "A policy must be read as a whole and its meaning construed according to its plain language." Spector v. Fireman's Fund Ins. Co., 451 F. App'x 130, 136 (3d Cir. 2011). "Ambiguities must be construed in favor of the insured because the insurer writes the contract, but a provision is ambiguous only if reasonable people could, in the context of the

---

[9] See also Meyer v. CUNA Mut. Ins. Soc., 648 F.3d 154, 162 (3d Cir. 2011) (citing Crawford v. Manhattan Life Ins. Co., 221 A.2d 877 (Pa. Super. Ct. 1966)); Bensalem Twp. v. Int'l Surplus Lines Ins. Co., 38 F.3d 1303, 1308-09 (3d Cir. 1994); Murphy v. Duquesne Univ. of The Holy Ghost, 565 Pa. 571 (Pa. 2001); Motley v. State Farm Mut. Auto. Ins. Co., 466 A.2d 609, 611 (Pa. 1983).

entire policy, fairly ascribe different meaning to it." Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co., 193 F.3d 742, 746 (3d Cir. 1999).

The reasonable expectation doctrine applies to commercial insureds, like Plaintiff. Id. (applying the reasonable expectations doctrine to the commercial machinery company); Reliance Ins. Co. v. Moessner, 121 F.3d 895, 905 (3d Cir. 1997). "[I]n certain situations the insured's reasonable expectations will be allowed to defeat the express language of an insurance policy." Bensalem Twp. v. Int'l Surplus Lines Ins. Co., 38 F.3d 1303, 1309 (3d Cir. 1994).

Courts in this Circuit and in Pennsylvania have routinely looked at the totality of the circumstances to determine the reasonable expectations of the insured.[10] Under this standard, a breach of contract analysis is intrinsically factual in nature and therefore would not be appropriate to decide on a motion to dismiss. See Connect America Holdings, LLC v. Arch Ins. Co., 174 F. Supp. 3d 894, 908 (E.D. Pa. 2016) (holding that it was inappropriate to rule on whether plaintiff breached its duty to cooperate with defendant at the summary judgment stage and it was for the factfinder to determine). Moreover, "[w]hile [the plaintiff] may have known of the change in the language of the exclusion clause when it renewed the policy, it should nevertheless have the opportunity to discover and submit evidence that Insurers had created in it a reasonable expectation that the policy would cover claims such as that presented by the [underlying litigation]." Bensalem Twp., 38 F.3d at 1308-09.

In view of these legal principles, the issues in this case at the motion to dismiss stage involve a review of the language in the Policies, effect of the language change over the years in

---

[10] See Ramara, Inc. v. Westfield Ins. Co., 69 F. Supp. 3d 490, 501 (E.D. Pa. 2014) ("Although the language of the policy normally provides the best indication of the parties' reasonable expectations in forming the contract, the totality of the insurance transaction must be examined to ascertain the reasonable expectations of the insured."); Collister v. Nationwide Life Ins. Co., 388 A.2d 1346, 1354 (Pa. 1978) ("Courts must examine the dynamics of the insurance transaction to ascertain what are the reasonable expectations of the consumer.").

the D&O policies, and whether the insured Plaintiff had a reasonable expectation that it was insured for the underlying shareholder claims.

First, a reasonable person could ascribe different meanings to the term "a Corporation" contained in the Arch Policy in context of the entire policy. In the Arch Policy, the definition of "Loss" excluded coverage of any:

> amount representing, or substantially equivalent to, an increase in consideration paid or proposed to be paid in connection with any purchase of securities or assets of <u>a Corporation</u> or any plaintiffs' counsel fees in any Claim alleging inadequate or unfair consideration . . . .

(Doc. No. 16-1 at 3 of 7) (emphasis added).

Defendants argue that the language in the Polices is clear and unambiguous because the term "Corporation" is defined as "the Named Corporation and any Subsidiary thereof, including any such organization as a debtor-in-possession under the United States bankruptcy law or an equivalent status under the law of any other country." (Doc. No. 16-1 at 2 of 14.) According to Defendants, because Plaintiff is the named Corporation, any purchase of securities or assets of Plaintiff is excluded under the provision. (Doc. No. 16 at 3-4.)

In contrast, Plaintiff argues that the language of the provision is unclear because of "the use of the word 'a' before 'Corporation.'" (Doc. No. 22 at 23.) Plaintiff argues that it is not the only Corporation referred to in the bump-up exclusion because Plaintiff is referred to throughout the Polices as "the Corporation" or "the Named Corporation," and therefore the use of the word "a" before "Corporation" in this provision makes the language unclear. (<u>Id.</u>) Additionally, the ambiguity is highlighted by other language in the same sentence in the Endorsement, which

contains the quoted exclusion referring to "the Corporation or a Corporation's business activities."[11] (Id. at 24.)

Therefore, viewing the facts in the light most favorable to the Plaintiff, a reasonable person could construe the use of the phrase "a Corporation" as meaning an entity other than Plaintiff. The exclusion is reasonably susceptible of different constructions and capable of being understood in more than one sense and the term is therefore ambiguous. See Indian Harbor Ins. Co., 804 F.3d at 313.

Second, Plaintiff has shown a reasonable expectation for coverage which is plausible at the motion to dismiss stage. As discussed, Defendants had provided Plaintiff with excess D&O coverage before September 2010. Plaintiff argues that "[b]ased on Defendants' agreement to match or exceed the expiring policies, including Defendants Arch's and Federal's own expiring policies, [Plaintiff] selected Arch as its new primary insurer." (Doc. No. 3 at 13.) Because Defendants offered to match or exceed the expiring coverage, Plaintiff expected that it would continue to have coverage for M&A claims that arose from acquisitions of Plaintiff, like those in the underlying shareholder litigation. (Doc. No. 22 at 9.) Moreover, Plaintiff argues that Arch narrowed the bump-up exclusion to the definition of Loss in order to more closely fit the polices that expired in 2010. (Supra n.8.)

For all these reasons, Defendants' Motions to Dismiss Count II alleging a breach of contract will be denied.

---

[11] (See Doc. No. 16-1 at 1 of 7) ("a written request by an Investigating Authority for an Insured Person to appear for an interview or meeting with respect to such Insured Person's capacity in the Corporation or a Corporation's business activities").

### B. Reformation

Defendants move to dismiss Count III seeking Reformation based on mistake, asserting that Plaintiff has failed to plead with the specificity required by Federal Rule of Civil Procedure Rule 9(b). (Doc. Nos. 16 at 14; 18 at 12.) Fed. R. Civ. P. 9(b) provides:

> In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

In Count III, Defendants contend that Plaintiff is relying upon the "mistake" prong of Rule 9(b).

Reformation is an equitable remedy granted by a court, and there is no right to a jury trial on the issue, even when the facts are in dispute. 8 Moore's Federal Practice § 38.31[7][a]. In this case, reformation can only be addressed by the Court after the factfinder has made a decision on liability on the breach of contract claim in Count II. Therefore, the Court will not dismiss Count III, but will reserve consideration until after trial on making a decision on its viability.[12]

### C. Fraud in the Execution

Defendants also allege Plaintiff failed to plead a claim for fraud in the execution as set forth in Count IV with the specificity required by Rule 9(b). (Doc. Nos. 16 at 16; 18 at 15.)

Under Rule 9(b), supra, "a plaintiff alleging fraud must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the 'precise misconduct with which [it is] charged.'" Frederico v. Home Depot, 507 F.3d 188, 200 (3d Cir. 2007) (quoting Lum v. Bank of Am., 361 F.3d 217, 223-24 (3d Cir. 2004)). To satisfy the pleading requirements of Rule 9(b), "the plaintiff must plead or allege the date, time and place of

---

[12] "In general, the power to temporarily stay proceedings lies within the informed, sound discretion of the district courts." Nicholas v. Wyndham Int'l, Inc., 149 F. App'x 79, 81 (3d Cir. 2005).

14

the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." Id. (citing Lum, 361 F.3d at 224).

This Court and other district courts in this Circuit have been relatively flexible in the application of Rule 9(b). Visuals Unlimited, Inc. v. Pearson Educ., Inc., No. 13-5681, 2014 WL 1395043, at *9 (E.D. Pa. Apr. 10, 2014) (Slomsky, J.) (citing Titan Stone, Tile & Masonry, Inc. v. Hunt Const. Grp., Inc., No. 05-3362, 2007 WL 174710, *2 (D.N.J. Jan. 22, 2007)). The Third Circuit explained that "in applying the rule, focusing exclusively on its 'particularity' language 'is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules.'" Christidis v. First Pennsylvania Mortg. Trust, 717 F.2d 96, 100 (3d Cir. 1983).

To state a claim for fraud under Pennsylvania law, Plaintiff must allege the following elements: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." Gibbs v. Ernst, 647 A.2d 882, 889 (Pa. 1994).

In the First Amended Complaint, Plaintiff alleges:

> If it is determined that the bump-up exclusion applies to claims arising from an acquisition *of* GDI rather than only to claims from acquisitions *by* GDI, then upon information and belief, the terms and provisions to which the parties previously agreed were improperly and purposefully omitted from the written and executed Policies.

(Doc. No. 3 at 28.)

To support this theory of fraud, Plaintiff has set forth the following facts in the First Amended Complaint:

15

- The six-year agreement among the parties that the bump-up exclusion applied only to acquisitions *by* GDI, as reflected in the detailed allegations regarding the prior policies that GDI bought going back to 2004 (FAC ¶¶ 55–64);

- Defendants' offer during the 2010 renewal to "match or exceed" the scope of coverage in the expiring policies, except as otherwise agreed (FAC ¶¶ 68–70, 144–146);

- Defendants' *failure* to disclose the purported expansion of the bump-up exclusion to encompass acquisitions *of* GDI even though Defendants raised other proposed reductions in coverage (FAC ¶¶ 84–96);

- Defendants' apparent attempt to conform the going-forward bump-up exclusion that was ultimately included in the Policies to Defendants' prior bump-up exclusion, based on the above-referenced agreements (FAC ¶¶ 99–103);

- Specific underwriting meetings in August 2010 and September 2011 at which Defendants focused their underwriting concerns on acquisitions *by* GDI, not on acquisitions *of* GDI (FAC ¶¶ 80–81);

- Communications by Arch in April 2012 showing that the limitation of the bump-up exclusion to acquisitions *by* GDI was acceptable because Arch was still focused only on such acquisitions *by* GDI (FAC ¶ 82);

- Communications between GDI and Arch in summer 2012—after GDI's CEO resigned— in which Defendants' first expressed concern that GDI might become an acquisition target, and in which Defendants agreed to address that concern not through a broader bump-up exclusion, but rather with increased premium and a higher retention for coverage of M&A claims such as the Underlying Litigation (FAC ¶¶ 105–110); and

- Statements by Defendant Federal's D&O vice president in February 2012—just months before the Policies were issued—showing that these agreements regarding the scope of the bump-up exclusion were consistent with, and indeed based on, the insurance industry's understanding of bump-up exclusions (FAC ¶ 54).[13]

---

[13] Specifically, Plaintiff's First Amended Complaint quotes the Senior Vice President and Global D&O Project Manager of Chubb Group of Insurance Companies, Federal's parent company, as follows:

> [t]ypically the bump-up exclusion has been designed to apply to additional considerations paid by *acquiring companies* that they pay above and beyond the initial offer . . . . [By contrast] most of the claims we're seeing today are characterized as breach of fiduciary duty claims against the *acquiree's* board of directors [i.e. claims such as the Underlying Litigation]. And so therefore the bump-up exclusion doesn't really get the kind of use it used to with these claims that have been taking place in the last couple of years.

(Doc. No. 22 at 30-31.)

First, the Court is satisfied Plaintiff has set forth various facts that, accepted as true and construed in a light most favorable to Plaintiff, can be construed as representations by Defendants that they would continue to provide insurance coverage as broad or broader than polices that had expired in September 2010.  Defendants offered during the 2010 renewal period to "match or exceed" the scope of the expiring policies.  (Doc. No. 3 at ¶ 68.)  "Arch offered to sell a primary D&O policy that provided coverage at least as broad as the expiring polices . . ."  (Id. at ¶ 69.)  Plaintiff also references specific underwriting meetings and communications with employees of Defendants Arch and Federal.  (Doc. No. 3 at ¶¶ 54, 80-82, 105-110.)

Second, the representations were material to Plaintiff's decision to select Defendants as the primary and excess insurers.  "Based on Defendants' agreement to match or exceed the expiring polices, inducing Defendants Arch's and Federal's own expiring polices, [Plaintiff] selected Arch as its new primary insurer."  (Id. at ¶ 73.)

Third, based on the Defendants' dealings with Plaintiff to 2013, there are enough facts alleged for the factfinder to decide whether Defendants' material representations were made falsely, with knowledge of its falsity or recklessness as to whether it is true or false.  (See Doc. No. 3 at ¶¶ 55-83.)

Fourth, Defendants intended that Plaintiff rely on the representations in order to become Plaintiff's primary and excess insurers in September 2010.  (See Id. at ¶¶ 71-73.)  Plaintiff has alleged that Defendants failed to disclose any alleged expansion of the bump-up exclusion to encompass acquisitions of Plaintiff, even though Defendants raised other proposed reductions in coverage.  (Id. at ¶¶ 84-96.)

---

(Doc. No. 3 at ¶ 54.)

Fifth, Plaintiff actually relied on Defendants' representation to match or exceed the expiring policies when they choose Defendants as the insurers. (Id. at ¶¶ 73-94.) Plaintiff asserts that if Defendants had indicated any intention to expand the bump-up exclusion to exclude claims such as the underlying shareholder litigation, Plaintiff "either would have refused to agree or at least would have demanded significant additional consideration." (Id. at ¶¶ 93-94.)

Sixth, Plaintiff claims that Defendants' material misrepresentations were the proximate cause of the injury suffered. "Defendants' fraud by execution is the proximate cause of significant damage to [Plaintiff], specifically, the $30 million underlying settlement that [Plaintiff] has had to bear on its own." (Id. at ¶ 182.)

These facts, taken in the light most favorable to Plaintiff, are sufficient to survive a motion to dismiss because Plaintiff has sufficiently plead fraud in the execution under Rule 9(b). Therefore, Defendants' Motion to Dismiss on Count IV will be denied.

## V. CONCLUSION

For the foregoing reasons, the Court will deny Defendants' Motion to Dismiss Count II, Breach of Contract, and Count IV, Fraud in the Execution, and take under advisement until after the trial Defendants' Motion to Dismiss Count III, Reformation. Count I will be dismissed by stipulation of the parties. (Doc. No. 29.) An appropriate order follows.