# EXHIBIT A

# EXHIBIT A
# TO UNSEALING ORDER

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

(PROCEEDING UNDER SEAL)

| | |
|---|---|
| Gardner Denver, Inc., | Docket #CV-16-159 (JHS) |
| Plaintiff, | |
| vs. | United States Courthouse |
| | Philadelphia, PA |
| Arch Insurance Company, | September 15, 2017 |
| et al., | 2:05 p.m. |
| Defendants. | |

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

TRANSCRIPT OF MOTION TO COMPEL
BEFORE THE HONORABLE JOEL H. SLOMSKY
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For The Plaintiff:          Barry I. Buchman, Esq.
                            Gilbert, LLP
                            Ste. 700
                            1100 New York Ave., NW
                            Washington, DC 20005

                            Richard G. Placey, Esq.
                            Montgomery McCracken Walker
                            & Rhoads, LLP
                            123 S. Broad St.-24th Fl.
                            Philadelphia, PA 19109

                            Kyle A. Poelker, Esq.
                            Gilbert, LLP
                            Ste. 700
                            1100 New York Ave., NW
                            Washington, DC 20005

For The Defendants:                     Justin K. Fortescue, Esq.
                                        White and Williams, LLP
                                        1650 Market Street
                                        One Liberty Place
                                        Philadelphia, PA 19103

                                        David Creagan, Esq.
                                        White and Williams, LLP
                                        1650 Market Street
                                        One Liberty Place
                                        Philadelphia, PA 19103

                                        Michael Goodstein, Esq.
                                        Bailey Cavalieri, LLC
                                        10 West Broad St.-Ste. 2100
                                        Columbus, OH 43215

                                        Beth L. Weisser, Esq.
                                        Fox Rothschild, LLP
                                        2000 Market Street-10th Fl.
                                        Philadelphia, PA 19103

                                        Janet R. Davis, Esq.
                                        Cozen O'Connor
                                        123 North Wacker Dr.-Ste. 1800
                                        Chicago, IL 60606

                                        Kristie M. Abel, Esq.
                                        Cozen O'Connor
                                        One Liberty Place
                                        1650 Market St.
                                        Philadelphia, PA 19103

Audio Operator                          Kerri Aiken

Transcribing Firm:                      Writer's Cramp, Inc.
                                        63 Dakota Drive
                                        Hamilton, NJ 08619
                                        609-588-8043

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

```
1                   THE CLERK:  All rise please.  Court is now in
2       session, the Honorable Joel H. Slomsky presiding.
3                   THE COURT:  Please be seated.  This is the case of
4       Denver, Inc. v. Arch Insurance Company, et al., Civil Action
5       #16-159.  And as counsel for the Plaintiffs, we have Barry
6       Buchman, Esquire.
7                   MR. BUCHMAN:  Good afternoon, Your Honor.
8                   THE COURT:  Good afternoon.  And seated with you at
9       counsel table is Richard Placey, Esquire.
10                  MR. PLACEY:  Good afternoon, Your Honor.
11                  THE COURT:  Good afternoon.  And Kyle Poelker,
12      Esquire.
13                  MR. POELKER:  Good afternoon, Your Honor.
14                  THE COURT:  Welcome.  And on behalf of the
15      Defendants -- let's see, I have to look at the docket to see
16      who represents which Defendant.  On behalf of Arch we have
17      David Creagan, Esquire.
18                  MR. CREAGAN:  Good afternoon, Your Honor.
19                  THE COURT:  Good afternoon.  And Justin Fortescue,
20      Esquire.
21                  MR. FORTESCUE:  That's right, good afternoon, Your
22      Honor.
23                  THE COURT:  Okay, welcome.  And on behalf of Federal
24      we have Janet Davis, Esquire.
25                  MS. DAVIS:  Good afternoon, Your Honor.
```

4

1       THE COURT:  Good afternoon.  And Kristin Abel,

2   Esquire.

3       MS. ABEL:  Good afternoon, Your Honor.

4       THE COURT:  Good afternoon, welcome.  And on behalf

5   of Continental Casualty Company, we have Matthew Olesh,

6   Esquire -- no, I'm sorry, Michael Goodstein, Esquire.

7       MR. GOODSTEIN:  Good afternoon, Your Honor.  I'm

8   pretty sure Mr. Olesh filed a withdrawal a while ago, but I

9   could be wrong.

10      THE COURT:  Okay.  He was terminated from the

11  docket.

12      (Laughter)

13      MR. GOODSTEIN:  I'll let him know.

14      THE COURT:  12/21/16.  I don't like the word

15  terminated.  In any event, also with you is Beth Weisser,

16  Esquire.

17      MS. WEISSER:  Good afternoon, Your Honor.

18      THE COURT:  Good afternoon.  We meet again.  The

19  Plaintiffs have filed a Motion to Compel Discovery.  And can -

20  - Mr. Buchman, tell me what's the status of it?

21      MR. BUCHMAN:  Yes, Your Honor, good morning -- good

22  afternoon, I should say.

23      MR. CREAGAN:  Your Honor, may I say something?

24      THE COURT:  Yes.

25      MR. CREAGAN:  Before these proceedings --

```
 1                 THE COURT:  You can be seated.  Everybody --
 2                 MR. CREAGAN:  Before these proceedings get
 3     started --
 4                 THE COURT:  -- has to speak into the microphone.
 5                 MR. CREAGAN:  -- Defendants request that the
 6     transcript of this discovery hearing be under seal.
 7                 MR. BUCHMAN:  And we consented to that, Your Honor.
 8                 THE COURT:  All right, I'll so order that it be
 9     placed under seal and not be made available publicly.
10                 MR. CREAGAN:  Thank you, Your Honor.
11                 THE COURT:  Okay.
12                 MR. BUCHMAN:  May I approach the podium?
13                 THE COURT:  Yes.
14                 MR. BUCHMAN:  Yes, so Your Honor, let me start with
15     the status.  As we previewed to Chambers in phone call to your
16     Chambers yesterday afternoon, we do have the --
17                 THE COURT:  Could you pull up the mic closer to you?
18                 MR. BUCHMAN:  Sorry.  We have made some progress,
19     even since the filing of the briefs a couple of weeks ago, and
20     we've been able to -- of the four categories that were briefed
21     in the pleadings, our motion and their oppositions, we've been
22     able to remove from the agenda, if you will, the issue of
23     other insured discovery and the issue of claims manual
24     discovery.  So the only issues, and they're different as to
25     each carrier, it's not that all three carriers have both
```

1    issues, but the only issues still in play writ large are

2    reinsurance discovery and drafting history and --

3              THE COURT:  What?

4              MR. BUCHMAN:  Drafting history of the bump-up

5    exclusion and related documents regarding industry

6    understanding and usage of that -- of the bump-up exclusion.

7         And so we have made some progress.  One of the things I'll

8    be asking for at the end actually is some, as a sort of

9    cleanup housekeeping issue, is maybe putting some hard

10   deadlines on things that have agreed to be produced.  We've

11   already had to ask you for one extension of the original Case

12   Management Order, we'd like to avoid having to come back for

13   more time.

14             THE COURT:  Okay.

15             MR. BUCHMAN:  And so --

16             THE COURT:  Now, I've read the motion and

17   memorandum, Document 56, which is Plaintiff's.  I have not

18   read every exhibit attached, but I looked at them.  There is a

19   -- Document 57 is Arch's opposition and Document 60 is

20   Continental Casualty's response.  And I take it from Documents

21   60 and 59, which is Federal Insurance's response, that with

22   respect to the reinsurance issue, they may not have any

23   documents.

24             MR. BUCHMAN:  That's correct.

25             THE COURT:  All right.

1           MR. BUCHMAN:  And so if I may, I'll actually tell --
2   walk through what the different issues, remaining issues, are
3   as to each carrier, sort of a preview.  And then, well, we've
4   actually, amongst ourselves -- subject to Your Honor's
5   approval, obviously we'll do it however you want, but we
6   thought rather than me arguing all three points, the one as to
7   Arch, the one as to Federal, and actually, we may have just
8   had some late-breaking news in the hallway, and at least on a
9   non-prejudiced basis, may be able to hold the issues in CNA in
10  abeyance.  Rather than arguing -- discussing all three points
11  at once, we thought we'd go issue by issue.  I would argue,
12  you know, they would respond, come back on the second issue,
13  if that works for Your Honor.

14          THE COURT:  That's fine.

15          MR. BUCHMAN:  Okay, thank you.  So the remaining
16  issue with Arch, Your Honor, is the discoverability in our
17  view, in Arch's view non-discoverability, of three claims
18  status reports that Arch provided to its reinsurers after the
19  underlying litigation arose and after we tendered our claim
20  for coverage for that underlying litigation.  These are --

21          THE COURT:  When you say Arch provided to the three
22  insurers, Arch is one insurer and who are the others?

23          MR. BUCHMAN:  No, so as Your Honor may recall from
24  the brief, one of the disputed categories is the
25  discoverability of these three Defendants' communications with

8

1    their reinsurers, that is the insurance companies --
2              THE COURT:  Oh, oh, the reinsurer, you're --
3              MR. BUCHMAN:  Yeah --
4              THE COURT:  -- doing the reinsurance first.
5              MR. BUCHMAN:  Right.
6              THE COURT:  Okay.
7              MR. BUCHMAN:  Right.  So we have a legal dispute
8    with Arch still.  It's been narrowed, but there is still a
9    legal dispute over the discoverability of three claims reports
10   that they provided to their reinsurers, Arch's reinsurers.
11             THE COURT:  And you know these exist as a fact?
12             MR. BUCHMAN:  Yes, and I'll explain how I know that,
13   which is that part of what's been going on since the end of
14   August is pre-production review of certain documents so we
15   could either agree or not as to their relevance.  And so I'll
16   come back that in a minute, I just want to give you the
17   roadmap on the other two, if that's okay.  So that's the issue
18   as to Arch.
19        The issue as to Federal pertains to drafting history,
20   documents regarding drafting history or generalized industry
21   understanding of the bump-up exclusion writ large, or bump-up
22   exclusions writ large.  Now, important to make a procedural
23   point here, and Ms. Davis and I have talked about this at
24   length, the two buckets of documents we're going to be talking
25   about in that regard with respect to Federal were part of our

9

1    original requests, were encompassed within our original

2    requests, which were much broader than these two buckets.  We

3    then proposed to narrow those, and we only moved on the

4    proposed narrowed requests.

5         Rather than -- but since we did that, we found out about

6    these other two buckets of documents related to the, you know,

7    drafting history and usage of the bump-up exclusion, one of

8    which, just by way of example, Judge, is the individual files

9    of Anthony Galban.  If you don't remember, Your Honor, Anthony

10   Galban is the Federal Executive, specifically the Vice

11   President of D&O Underwriting, whose statement regarding the

12   industry understanding of the bump-up exclusion we quoted

13   verbatim in our complaint.  And of course, the complaint is a

14   starting point for what the claims and defenses are in the

15   case and thus, you know, what's relevant.

16        So the two buckets are his files, whether or not they

17   relate to the five GDI bump-up exclusions that we discussed in

18   the motion, that is the five bump-up exclusions that GDI had

19   in the 10 year period we've talked about before.  And then the

20   other bucket of Federal documents is they have two -- you

21   know, one of Federal's points has been, look, we're only

22   excess to these five GDI bump-up exclusions.  We since have

23   learned that Federal, who is a prolific player in the D&O

24   marketplace, even more so than Arch and CNA, has two primary

25   D&O policy forms, specimen forms, with their own bump-up

10

1    exclusions that are similar to, though not identical to, the

2    five so-called GDI BUEs.  And so we've asked for those

3    documents as well.

4         And so what we've done, Judge, is rather than just revert

5    back to our original requests, which encompassed that, but a

6    whole lot more, which was the starting point for the problem,

7    we've just in the last couple of days served supplemental

8    requests targeted discretely and surgically at just those two

9    buckets to show that we're trying to be reasonable and not

10   pose an undue burden.  And the reason why we're raising it

11   today, and we're doing this by agreement with Ms. Davis, is in

12   the interest of judicial economy.  Rather than waiting for her

13   to file her formal 30-day response, we've already been meeting

14   and conferring about these two buckets.  We thought what we

15   might do is akin to what we did on July 5th when, although we

16   were only formally before you on the category 1 discovery

17   dispute, you gave us some advance guidance on the category 2

18   disputes that we're now here on today.  We thought that a kind

19   of advance guidance again on these two buckets and our

20   supplemental requests, which I have a copy of if Your Honor

21   wants, and there's only six of them, would be useful in our

22   ongoing discussions.  So that's Federal.

23        And then lastly, with CNA, we have a process issue,

24   although again, I think we may have just made some progress

25   out in the hallway, with respect to what they did to search

11

1    for drafting history, and in particular, the drafting history

2    of their prior side a only policy sold to GDI, which Your

3    Honor may recall from prior proceedings, which they argued to

4    you in category 1 was based on their own form that they

5    crafted and therefore it's their, you know, bump-up exclusion.

6    We have -- Mr. Goodstein and I have talked about a possible

7    certification or talked about a certification regarding their

8    search efforts.  Obviously I would want time to review that in

9    detail with my client and co-counsel, and it may resolve the

10   issue.

11        So let me start, if I may, with the substance of the

12   legal dispute on these three reinsurance documents with Arch,

13   and then Mr. Creagan can respond.  As I said, they are three

14   claim status reports that Arch provided to its reinsurers

15   about the underlying shareholder litigation that gives rise to

16   this coverage case and about Gardner Denver's corresponding

17   coverage claim.  We've already -- Mr. Creagan and I have

18   already discussed, and he has confirmed, that there are no

19   communications with their reinsurers from before our claim

20   arises about GDI or anything about this case; that was one of

21   the points Mr. Creagan made in Arch's brief is that this is

22   treaty reinsurance not facultative reinsurance, it's not

23   reinsurance specific to GDI's policy.  Those -- that issue is

24   off the table.  These three documents are specifically about

25   the underlying litigation at issue, the underlying settlement

1    at issue and our coverage claim at issue.

2         Now, how do I know that, to Your Honor's question.

3    Shortly after we filed the Motion to Compel, Mr. Creagan

4    approached me about coming up to review on a pre-production

5    basis, obviously therefore the fact that it was non-

6    prejudiced, meaning that the fact that he was showing them to

7    me did not waive his right to contest their discoverability,

8    to see if maybe we would agree that they were not

9    discoverable.  And there were actually two categories we did

10   that on, reinsurance and claims manuals.  He didn't have other

11   insured and Arch has agreed to produce the drafting history of

12   the only one of the five GDI BUEs that they have drafting

13   history on, which is the one in the Arch enhancement

14   endorsement.

15        I was a little bit apprehensive, as I told Mr. Creagan at

16   the time, if only because the whole point of discovery being

17   broader than admissibility is that you don't have to determine

18   in a vacuum at the outset, before you've seen any documents

19   from the insurers, much less any deposition -- and I should

20   note in that regard, at the time we did this review, which was

21   this past Monday, we had not seen a single document from any

22   of the insurers.  As of two weeks ago, GDI has produced 25 --

23   approximately 25,000 pages of documents --

24             THE COURT:  Is that all?

25             MR. BUCHMAN:  What's that?

13

1          THE COURT:  Is that all?

2          MR. BUCHMAN:  That's it, Judge.  I know there are

3    cases with more.

4          THE COURT:  Is the claim that these status reports

5    may contain language to the effect of our saying to the

6    reinsurer, hey, we could be on the line here based upon an

7    ambiguity in the policy and the language and the

8    interpretation and et cetera?

9          MR. BUCHMAN:  Right.  ████████████████████████

██ ████████████████████████████████    ████████████████████

██ ████████████████████████████████████████    ███████████

██ ████████████████████████████████████████████

██ ██████████████████    ██████████████████████████████████

██ ████████████████████████████████████████████████

██ ████████████████████████████████████████████████

██ ████████████████████████        And so what they do is show what they raised,

17   when they raised it, and of particular significance, they

18   discuss these -- what we describe in our brief as the

19   allocation issue, which is a separate coverage issue in this

20   case, after the bump-up exclusion issue, which is even if this

21   claim is otherwise covered, say the insurers, a significant

22   portion of the underlying $30 million settlement is

23   attributable to KKR, who's not our insured, rather than GDI,

24   who is insured by us, right.  And so they discuss that issue,

25   they discuss the relative risks and issues in the underlying

14

1    litigation --

2            THE COURT:  How do you know this?  Have you seen the

3    documents?

4            MR. BUCHMAN:  Yes.  I'm sorry, Judge, so I didn't

5    finish the process point.  So -- I apologize, I got diverted.

6    So the problem I had conceptually was it put me in that

7    position of having to decide ultimate relevance before I'd

8    seen a single document from the insurers.  And I nonetheless

9    agreed to do it.  We sent two people up there, including my

10   colleague, Mr. Poelker and Mr. Rubinstein who was here for the

11   Motion to Dismiss hearing last year.  And we went up there to

12   look at it.  And we looked at both these three reinsurance

13   reports and the claims manuals.

14       And this process has already benefitted Arch because

15   based on that review and notwithstanding the reservations that

16   I just mentioned, we agreed to forego the claims manuals.  So

17   that's now off the table.  The only thing we asked for was

18   these three reinsurance claim status reports ███████████████

█████  ███████████████████████████████████████████████████████████

█████  █████████████████████████████████████████████████████████

█████  ███████████

22           THE COURT:  Let me see if I understand this.  At the

23   invitation of Arch, your representative read these documents,

24   but then Arch is not willing to give you a copy of it?

25           MR. BUCHMAN:  That's correct.

15

1              THE COURT:  Okay.

2              MR. BUCHMAN:  We're talking about 30 pages, maybe

3    less.  It's three documents; each one is, at most, 10 pages.

4    So we're beyond any kind of burden or proportionality

5    discussion.  These could be scanned and emailed this

6    afternoon, if Your Honor orders their production.

7              THE COURT:  Okay.

8              MR. BUCHMAN:  And so we asked for those three

9    documents, not the claims manuals.  ████████████████████████

   ██ ████████████████████████████████████████████████████████

   ██ ████████████████████████████████████████████

   ██ ████████████████████████████████████████████████████████

   ██ ████████████████████████████████████████████████████████

   ██ ████████████████████████████████████████████████████████

   ██ ████████████████████████████████████████████████████████

   ██ ████████████████████████████████████████  ████████████████

   ██ ████████████████████████████████████████████████████████

   ██ ████████████████████████████████████████████████████████

   ██ ████████████████████████████████████████████

21             And Arch's response was you have to tell us why these

22   are ultimately relevant to your case, to which my client's

23   response was I don't need to show you today how I'm going to

24   use this in my order of proof on a Summary Judgment Motion or

25   in front of a jury at trial or how much weight Your Honor or

1   a jury is going to decide it's entitled to.  It's a document

2   that's not privileged, it's a claim status report, okay, from

3   the Director of cedent claims or reinsurance claims at Arch

4   to the reinsurer about our claim and about our underlying

5   litigation, discussing one of the very issues, allocation,

6   that you've raised in this case.

7        And Arch's response was but it doesn't contain a

8   statement against interest, an admission that the bump-up

9   exclusion doesn't apply here.  It doesn't contain a statement

10  as explicit as Mr. Galban's statement that Your Honor quoted

11  in your Motion to Dismiss opinion.  And I said that's not the

12  standard on discovery.  And with the Court's indulgence,

13  there's a case that we cited specifically on reinsurance from

14  this Court, the <u>Saldey (ph.) v. Paul Revere case, 224 F.R.D.</u>

15  <u>1691</u>, that order discovery of a variety of things, including

16  reinsurance.  And the Court said, in response to a similar

17  argument by the insurer there, the following, {quote} "While

18  it is true that the depositions to date of those employees

19  who handled Plaintiff's claim have not produced statements by

20  those employees that they were implementing the insurance

21  company's bad faith policy to deny valid claims, we agree

22  with Plaintiff, that is, the policy holder, that blatant

23  admissions of wrongdoing are not required in order to

24  establish a nexus for discovery."  And the Court went on to

25  say that reinsurance communications were discoverable later

17

1   in the opinion.

2       That is similar to the Baxter case that we cited on

3   reinsurance, a post-December 15 proportionality amendment

4   case decided just earlier this year, where the Court said, ·

5   look, it's clear to me from the documents I've already seen

6   on reinsurance that they address, at least to some extent,

7   {quote, unquote} "the scope of coverage."  There doesn't have

8   to be a smoking gun statement against interest or an explicit

9   statement that this is industry custom and practice on the

10  bump-up exclusion.  That is not the standard at this stage.

11      THE COURT:  The bottom line is this, Rule 26(b)(1)

12  in terms of scope says parties may obtain discovery regarding

13  any non-privileged matter that is relevant to any party's

14  claim or defense.  And then it goes on to talk about

15  proportionality.

16      MR. BUCHMAN:  That's right.  And we're talking about

17  30 pages of documents at most --

18      THE COURT:  And tell me how is it relevant to a

19  claim or defense?

20      MR. BUCHMAN:  Well, let's take the easiest --

21      THE COURT:  You've read them now, what's in them?

22      MR. BUCHMAN:  What's that?

23      THE COURT:  You've read them now, what's in there

24  that's relevant to a claim or defense?

25      MR. BUCHMAN:  ████████████████████████████

18

1  ███████████████████████████████████████████

2  ███████████████████████████████████████████████

3  ████████████████████████████████████████████

4  █████████████████████████

5          THE COURT:  ██████████████████████████

6          MR. BUCHMAN:  I'm sorry?

7          THE COURT:  ████████████████████████████████

8  ████████████████████████████

9          MR. BUCHMAN:  █████████████████████████

10 ████████████████████████████████████████████████

11 ██████████████████████████

12         THE COURT:  Oh, okay.

13         MR. BUCHMAN:  ████████████████████████████

14 ██████████████████████████

15         THE COURT:  Why is that statement relevant?

16         MR. BUCHMAN:  Judge, how they raise the defense,

17 what order is it -- if it was just a throw-in, you know, it

18 was discussed among a bunch of other issues, a bunch of other

19 coverage defenses that they raised, I think that goes to the

20 issue of how clear and unambiguous they thought the issue was

21 at the time.

22         But let me make it easier.  Let's talk about allocation

23 because we can debate -- excuse me -- pure policy

24 interpretation.  We cited a case to this Court in our motion

25 at pages 16 and 17 of our brief, the name of the case is

19

1    <u>National Union v. Continental</u>, out of the Northern District

2    of Illinois, the same case that decided the <u>Baxter</u> case just

3    a few months ago on reinsurance.  The cite for <u>National Union</u>

4    is 116 F.R.D. 78, okay.  And that was a case -- that is a

5    case that is virtually on all fours to what we're dealing

6    here with allocation.  It is a case that involved underlying

7    securities litigation and thus was a case about coverage

8    under a D&O policy.  And among other defenses that the

9    insurer raised was a defense that was intertwined with the

10   nature of the underlying litigation.  They disputed how the

11   policyholder settled the case; they said it was a violation

12   of the cooperation clause, how they settled the case.  And

13   what the Court said, and we quoted it on page 16 and 17 of

14   our brief, what the Court said is that these insurers and

15   these reinsurance communications {quote} "may well have

16   discussed their positions on the proposed underlying

17   securities settlements or their positions in general in the

18   underlying securities litigation with some or all of their

19   reinsurers.  Any such discussions would obviously be

20   relevant."

21       As I said, the allocation defense is intertwined with

22   the underlying litigation because it's a defense that says

23   GDI, you paid too much, KKR didn't pay enough.  Okay.  ▮▮▮

1   ████████████████████████████████████████████

    █  █████████████████████████████

3        And so -- and this relevancy point on allocation is

4   buttressed by the fact, Judge, we mentioned this in our brief

5   as well, that we offered -- because I said to the insurers

6   during the meet and confer, look, we can debate the discovery

7   of reinsurance communications on policy interpretation.  We

8   think the weight of authority goes our way, but obviously

9   they have a couple of cases going the other way.  There's no

10  anti-<u>National Union</u> case that says even if it's a collateral

11  issue related to the underlying litigation, like notice in

12  Rhone-Poulenc III, as we labeled it, like allocation,

13  <u>National Union</u> says that's clearly relevant.  So I said,

14  look, if you guys drop the allocation defense, right, which

15  is a throw-in, back-up, fall-back defense anyway, you know,

16  if the bump-up exclusion defense fails, we will withdraw our

17  reinsurance discovery, our request for reinsurance discovery.

18  That offer was turned down.

19       The insurers and Arch, particularly in this instance

20  relevant here, decided that it wants to continue pressing the

21  allocation defense, and now it is refusing --

22            THE COURT:  Let me make sure I understand this.

23            MR. BUCHMAN:  Yes.

24            THE COURT:  Arch is contending that when GDI settled

25  the claim in those underlying lawsuits that they paid too

1    much, and therefore -- is that what --

2            MR. BUCHMAN:  They're not claiming that the $3

3    million overall was too much vis-a-vis the Plaintiff --

4            THE COURT:  Explain to me the allocation then.  I

5    didn't get a clear understanding of it from the --

6            MR. BUCHMAN:  Sure.

7            THE COURT:  -- from the brief.  Go ahead, say it.

8    Explain it to me.

9            MR. BUCHMAN:  So the allocation issue is not one

10   that says $30 million was too much for the Defendants

11   collectively to the pay to the Plaintiffs.  Allocation says

12   within that $30 million, you, GDI, as one Defendant, should

13   not have paid the $30 million in full.  KKR, who was a co-

14   Defendant but against whom the claims were entirely

15   derivative --

16           THE COURT:  Oh, I see.

17           MR. BUCHMAN:  -- of the claims against you should

18   have kicked in a significant share, thereby reducing our

19   obligation to you because we only insure you, not KKR.  So

20   even though it is not an issue that challenges the

21   reasonableness of the underlying settlement writ large, it is

22   a defense that challenges the reasonableness of GDI's

23   contribution to that settlement.

24           THE COURT:  All right.  Now given that, how does

25   reinsurance come into play?

1          MR. BUCHMAN:  It comes into the play the same way

2    the <u>National Union</u> Court said it comes into play, which is by

3    definition, that defense looks to what were the relative

4    risks of GDI versus KKR in the underlying litigation.

5          THE COURT:  All right, now, my understanding is that

6    each insurer in following form had $10 million worth of

7    insurance.  Why are reinsurers being put on notice?

8          MR. BUCHMAN:  I think the reinsurance policies that

9    these -- well, CNA has learned that it doesn't have any

10   reinsurance at all, but -- for these GDI policies, but the

11   idea is that reinsurance is basically an insurance policy on

12   the insurance policy, right?  So what Arch is saying is look,

13   if we have to pay these guys we're going to -- to GDI that

14   is, if we have to pay GDI on their coverage case, we're going

15   to be looking at you to reimburse us.

16         THE COURT:  All right, so in other words, the

17   reinsurance may have some, for lack of a better word,

18   deductible.  And above that, it could be a million, 2

19   million, 3 million above that, they would have to pay the

20   claims of Arch, et cetera, whoever has the reinsurance.  But

21   so that what you're saying is that these three reports would

22   discuss the approach of Arch to do what?  To do what?

23         MR. BUCHMAN:  ██████████████████████████
██  ████████████████████████████████████████████████████
██  ████████████████████████████████████████████████████████

1 ████████████████████████    ██████████████████████

██  ██████████████████████████████████████

3          THE COURT:  So they're relevant to the issue of

4    allocation.

5          MR. BUCHMAN:  At a minimum.  At a minimum.  And

6    that's exactly what National Union says.

7          THE COURT:  We're not saying they're relevant to the

8    issue of the interpretation of the loss clause in the

9    policies?

10          MR. BUCHMAN:  I believe that they are because I

11    believe even merely how you describe your -- to your

12    reinsurer the coverage defenses you've raised vis-a-vis your

13    policyholder is potentially relevant.  I think that's an

14    admissibility and weight issue and not a discoverability

15    issue, even if it's not a smoking gun admission, you know, as

16    I was saying earlier.  But my point in focusing on allocation

17    is that even if one were to disagree with that, given the

18    National Union case, it's hard to see how it wouldn't be

19    relevant, at least to the allocation issue --

20          THE COURT:  Okay.

21          MR. BUCHMAN:  -- and I would like -- you know, the

22    National Union said something very -- in terms of my offer to

23    withdraw reinsurance and how you can't press a reinsurance --

24    a defense like that and then block reinsurance discovery on

25    it, the National Union Court said, in talking about a

24

1    separate issue on which reinsurance was discoverable, which
2    was the insurers argument that the policyholder had made
3    misrepresentations during the underwriting process, the
4    National Union Court said, and I quote, "Insurers
5    conveniently ignore the inconsistency between, one, their own
6    insistence that discovery is impermissible when it may lead
7    to information as to matters on which they relied, and two,
8    their own persistent efforts to keep their reliance a live
9    issue in these lawsuits."  I skipped a few words, they'll put
10   brackets in there.  But the point is, and this Court said the
11   same thing in Rhone Poulenc III, in November of 1991 when it
12   said, "By raising a defense" -- in that case notice, in this
13   case allocation -- "a party opens the door to discovery
14   concerning that defense."
15              THE COURT:  Okay.
16              MR. BUCHMAN:  And so when you consider that
17   relevance point and then you consider the fact that we're
18   talking about 30 pages --
19              THE COURT:  Okay.
20              MR. BUCHMAN:  -- I think the balance is clear.
21              THE COURT:  Now let me, let's go on -- let's go on
22   to Federal's drafting history, the file of Anthony -- how do
23   you --
24              MR. BUCHMAN: Did you want me to do that now or did
25   you want Mr. Creagan to respond on the issues?

1          THE COURT:  Oh, you want to respond to it?

2          MR. CREAGAN:  I'd like to respond, Your Honor, if I

3   may.

4          THE COURT:  Okay.  Okay.

5          MR. BUCHMAN:  Thank you, Your Honor.

6       (Pause in proceedings)

7          MR. CREAGAN:  First of all, let me say I am

8   gratified that we were able to work out three of the four

9   issues that separated us.  Three out of four, that's not bad.

10  We're left with reinsurance.  I'll be brief and I'll limit

11  myself to a few points.  The first point, in GDI's motion to

12  compel discovery of these reinsurance communications, they

13  state, "the requested communications may show the defendants

14  have taken inconsistent positions on that issue, i.e., the

15  issue of what does this bump-up exclusion mean?"  It's the

16  contract interpretation issue.  The communications also will

17  shed light on insurance industry custom and practice, in

18  other words because Arch is in insurance company and it's

19  reinsurers are -- reinsurance companies, they're all in the

20  business, they're all in the industry.  There could be a

21  discussion of the issue in this case, and perhaps that

22  discussion would shed some light on what the insurance

23  industry in general thinks about bump-up exclusions in

24  general, to the extent that's even -- even matters in this

25  case.

1            THE COURT:  Put those aside.

2            MR. CREAGAN:  No, those are the points that they

3    made.

4            THE COURT:  Well, Mr. Buchman did not argue those

5    points.

6            MR. CREAGAN:  Well, so now he's arguing the

7    allocation --

8            THE COURT:  So, he's strictly --

9            MR. CREAGAN:  -- and let me get to that --

10           THE COURT:  -- mainly the allocation.

11           MR. CREAGAN:  The cases he cites, for example, are

12   all instances where the plaintiff, it's usually the plaintiff

13   who's requesting these communications has not actually seen

14   them.  So the words of the court in the Saldi v. Paul Revere

15   case for example, are -- which permitted discovery of

16   reinsurance communications because they  -- they may

17   contained admissions, or otherwise show the insurer's state

18   of mind concerning plaintiff's insurance claim.  The Baxter

19   case may contain relevant information.  The other case that

20   is cited, the National Union case, "insurers may well have

21   discussed their positions on the proposed settlements."

22   Well, we're no longer in the realm of "may well have, might,

23   could be."  We've got the documents.  GDI's lawyers have the

24   opportunity to review then, and as we told them when we

25   extended the invitation to come up to Philadelphia and take a

27

1   look at White and Williams, we said, "You know, we don't

2   think there's anything in there.  We don't think there are

3   any inconsistent positions, statements, industry custom and

4   practice, et cetera, but you don't have to take our word for

5   it, come up and take a look and you'll see that none of that

6   is there," which they did.  Now, since then he's gone onto

7   the allocation argument which is something that we hadn't

8   heard before.  I've got copies of the three reports; this

9   hearing is sealed.  I've got copies of the three reports here

10  with me and I can say that █████████████████████████

    ██ ███████████████████████████████████████████████████

    ██    ███████  and no different from what GDI has been told multiple

13  times by Arch in much more detailed reservations of rights

14  letters.  ██████████████████████████

    ██ ████████████████████████████████████████████████████

    ██ ████████████████████████████████████████████████████

    ██ ██████████████████████████████████████████████████

    ██ ████████████   ██████████████████████████████████

    ██ ██████████████████████████████████████████████████████

    ██ ██████████████████████████████████████████████████

    ██ █████████████████████   ███████████████████

    ██ ███████████████████████████████████████████████████

    ██ ██████████████████████████████████████████████

    ██ █████████████████████████████████   █████████

    ██ ████████████████████████████   ███████████████

28

4           THE COURT:  If it's so de minimis why are you

5      fighting -- giving it to him?

6           MR. CREAGAN:  Because that's a very good question, I

7      knew you were going to ask it.  It's the sort of no harm no

8      foul question, but the answer to that is the reinsurance

9      relationship is primarily a confidential business

10     relationship.  It really has nothing to do with coverage,

11     coverage in the -- of the insurance company's or the ceding

12     company's insured.  It's just -- it has to with how --

13     whatever risk the insurer faces when it potentially has to

14     pay a claim from it's insured, whatever risk it faces is

15     spread.  You know, I mean, that's the whole purpose of

16     insurance obviously.  And these --

17          THE COURT:  And read these -- this is a treaty

18     policy.

19          MR. CREAGAN:  -- and there is a -- on the part of

20     reinsurers who enter into these agreements with insurance

21     companies and on the part of the insurer's themselves, there

22     is an expectation of confidentiality because, again, it is a

23     business relationship between the two of them that really

24     doesn't concern anyone else.

25          THE COURT:  Also, I read that it's a treaty kind of

1    reinsurance.

2            MR. CREAGAN:  It is.

3            THE COURT:  It doesn't just cover one claim, it

4    covers a broad --

5            MR. CREAGAN:  That is correct, it's a book of

6    business.

7            THE COURT:  So why can't you just, without revealing

8    the name of the reinsurance company, just excise, or with a

9    scissor, just give them the few lines are relevant?

10           MR. CREAGAN:  I'm not -- I'll be completely frank

11   with you, Your Honor.  I'm not authorized by my client to

12   agree to that.  Arch's position, and this is not unique to

13   Arch, but perhaps Arch is taking a tougher line on this than

14   some insurers.  Arch's position is that its agreements with

15   its reinsurers are confidential and nobody's business.

16           THE COURT:  The reinsurers?

17           MR. CREAGAN:  With its reinsurers.  Yes, I'm not --

18   obviously there are tons of communications with its insured,

19   GDI.  I mentioned the multiple of reservations of rights

20   letters which discuss both the allocation issue and the

21   contract interpretation issue at much greater length than

22   this brief sentence in their reinsurance reports.

23           THE COURT:  All right.  So if I order it you got to

24   turn it over?

25           MR. CREAGAN:  If you order we'll have to turn it

30

1   over but, you know again, I'll just go on the record, Arch is

2   opposed.

3           THE COURT:  Is it similar to -- is it similar to

4   language in the three status reports, being very limited?

5           MR. CREAGAN:  ██████████████████████████████

██ ███████████████████████████  ██████████████████████

██ ████████████████████████████████████████████████████

██ ████████████████████████████  █████████████████████

██ █████████████████████████████████████████████████████

██ ████████████████████████████████████████████████

11          THE COURT:  Okay.  Well, I think there's relevance

12  in the reports but I don't think there's relevance in the

13  entire report.  I mean, these things are 30 pages.

14          MR. CREAGAN:  No, they're much shorter than that.

15  When Mr. Buchman -- said 30 pages, he was talking about the

16  entire universe.

17          THE COURT:  Okay.

18          MR. CREAGAN:  So, each -- for example, the third

19  report, which I have here right in front of me is basically

20  three and a half pages.

21          THE COURT:  Okay.  Well, if at trial there is going

22  to be any allocation defense, it -- some of that language is

23  relevant.  I would ask you -- I will order it be turned over.

24  You don't have to turn over the identity of the reinsurer,

25  you don't have to turn over the reinsurance treaty or the

31

1   agreements, just from the status report I would ask you, Mr.

2   Creagan to give Mr. Buchman an excise version of the

3   three --

4          MR. CREAGAN:  Of each one of the three?

5          THE COURT:  Each one.  It just contains the -- this

6   narrow pertinent language that discusses allocation, or is

7   similar in effect to the reports you've already turned over

8   from the adjustor or whoever it is.  I forget what you said.

9   But just that narrow information so that at trial the

10  plaintiff is not surprised by any claim about allocation.

11  So, again, my ruling is very narrow.  I forget the term you

12  used for what you already returned over, and then you've got

13  the claim report and what --

14          MR. CREAGAN:  The -- I was referring to the

15  reservation of rights letters.

16          THE COURT:  The reservation of rights letters.

17          MR. CREAGAN:  Right.

18          THE COURT:  So whatever parallels the language in

19  the reservation of rights letter that is in the status

20  report, I think has to be turned over with respect to -- to

21  what, allocation, and was there something else, Mr. Buchman?

22          MR. BUCHMAN:  No, that was it, Judge.  I just want

23  to clarify though.  Although each report builds on the other,

24  it's not clear in the third report when each was added.

25          THE COURT:  When what?

1          MR. BUCHMAN:  In the third report it's -- I'm sorry.

2          THE COURT:  You can be seated.  You can be -- speak

3     into the mic.

4          MR. BUCHMAN:  Okay.  I just wanted a clarification

5     at that we're going to get all three reports.  There's

6     actually nine, it's the same three reports sent to the --

7          THE COURT:  Yes, the three --

8          MR. BUCHMAN:  Yes.  Okay.

9          THE COURT:  -- the pertinent language in the three

10    reports --

11         MR. BUCHMAN:  Okay.

12         THE COURT:  -- to this claim.

13         MR. BUCHMAN:  Thank you, Your Honor.

14         MR. CREAGAN:  Understood, Your Honor.  Thank you.

15         THE COURT:  Okay?  So, I'll so order and I guess you

16    can order the transcript and show it to your client, okay?

17         MR. CREAGAN:  Very good.  Thank you, Your Honor.

18         THE COURT:  All right.  Now, it was with respect to

19    Federal and the drafting history?

20         MR. CREAGAN:  Yes, Your Honor.

21         THE COURT:  You know, I really should hear from

22    Federal because how can the files of -- is it Anthony

23    Boudain?  What's his name?

24         MS. DAVIS:  Galban.

25         THE COURT:  Galban?

.

1            MS. DAVIS:  Yes.

2            THE COURT:  And talking about policy interpretation,

3      that being relevant here --

4            MS. DAVIS:  Would you like for me to address that or

5      do you want to let Mr. Buchman go first?

6            THE COURT:  Well, that's -- in effect, yes.  Go

7      ahead.

8            MS. DAVIS:  From here, is that okay?

9            THE COURT:  Yes, that's fine.  You can remain

10     seated.

11           MS. DAVIS:  So, Your Honor, Mr. Galban is the

12     product line leader for Chubb for D&O policies, but Chubb

13     does not have any language at issue in this case.  So, based

14     on your prior direction from our last hearing by phone, we've

15     agreed to produce all of the underwriting files, what --

16     because you told us we should so we're doing it.  Obviously

17     we're going to produce all the underwriting files for all the

18     policies -- D&O policies for which Chubb was in the GDI

19     program.  But Chubb does not have any policies at issue for

20     which they wrote any language, so the language which Mr.

21     Buchman continues to refer to as the bump-up exclusion, which

22     we prefer to refer to as Your Honor does, as part of the loss

23     definition -- we don't have any of our language at issue, so

24     what he's looking for now and what Mr. Galban, you know,

25     potentially has something relevant to, is the Chubb primary

1    policies that Chubb issued that contain an exclusion, which

2    I'm sure Mr. Buchman will argue is similar.  We say it's

3    dissimilar to the ones that were issued to GDI, but none of

4    the language at issue in this case or even in the policies

5    which we say are not at issue in this case previously issued

6    to GDI, contains language issued by Chubb.  So --

7         THE COURT:  But when the policy was issued, and I

8    know the defendants have argued that the policy is clear on

9    it's face.  But when the policies are issued there must have

10   been some understanding, some intent by Federal as to what

11   was covered and what wasn't covered.  They didn't blindly

12   become an excess -- engage in the excess insurance business

13   without understanding the risk.

14        MS. DAVIS:  Absolutely, Your Honor, and our

15   underwriting files are -- will be produced with respect to

16   the policies issued to GDI.  And so anything that's in there,

17   you know --

18        THE COURT:  Yes, but custom and --

19        MS. DAVIS:  -- the discussion about what the risk

20   was will be revealed in --

21        THE COURT:  But in --

22        MS. DAVIS:  -- those underwriting files.

23        THE COURT:  -- in interpreting insurance policies,

24   custom and usage is in play so that whatever's in Mr. -- his

25   name is --

1            MS. DAVIS:  Anthony Galban.

2            THE COURT:    -- Mr. Galban's file regarding drafting

3    history on interpretation of those clauses come into play

4    now.  It's his -- when we talk about his individual file, I

5    don't think we have to make available his personnel file or

6    anything of that nature.  I don't think that's what is in

7    play.

8            MS. DAVIS:  But, Your Honor, let me -- if I may.

9    There -- Mr. Galban doesn't have anything about the

10   underwriting history of the policies issued to GDI.  He was

11   not --

12           THE COURT:  Then that ends it if your response is it

13   doesn't exist, it doesn't exist.

14           MS. DAVIS:  Right, he was not the underwriter for

15   these policies.  What Mr. Buchman is not looking for is what

16   Mr. Galban has about other policies issued by Chubb, not to

17   GDI, not in an excess status, but in a primary basis relating

18   to a "similar" with air quotes because I don't agree that

19   they're similar, but I'm sure Mr. Buchman will argue that

20   they are -- similar policies, policy language, but -- that

21   has -- was never issued to GDI by Chubb.  So we've already

22   said we have -- you know, we are going to give the

23   underwriting files for the policies issued to GDI.  If

24   there's anything in there, great, they'll have it but we

25   don't have any drafting history for the language which is not

1   our language.

2           THE COURT:  All right.  If there's anything in the

3   file that relates to drafting history of similar clauses,

4   even if it's in other policies and that he's talking about,

5   and not the specific policy and issue here, it's all part of

6   custom and usage it has to be turned over.  So I'm going to

7   ask you to go through that file and see whether -- unless

8   you've done it already -- see whether anything exists.  I

9   don't find just tenable the argument that if he's not

10  discussing this specific clause and this specific policy, it

11  doesn't have to be turned over.  If he's discussing drafting

12  history of similar clauses in other policies, it has to be

13  turned over.  Now, when I say similar clauses I don't mean

14  exactly paralleling to the word, the language in this

15  specific policy but any discussion that touches upon the

16  subject matter of coverage in this situation would have to be

17  turned over.  That would be relevant.

18          MS. DAVIS:  So, if I may, Your Honor.  I don't have

19  -- you know, obviously we disagree but we respectfully will

20  do as you order, of course.  But where we may get into some

21  discussion with Mr. Buchman is about what similar means I'm

22  sure that, you know, we will have that discussion.

23          THE COURT:  Okay.

24          MS. DAVIS:  But I understand your ruling and we'll

25  proceed.

1          THE COURT:  Okay.  Have I covered the two points

2     under Federal that you raised?

3          MR. BUCHMAN:  I think so, Judge.  Just so that the

4     record is and particularly since we have to as Ms. Davis

5     said, have continuing discussions, I just want to confirm

6     Your Honor's -- that I heard correctly that you don't want to

7     get into a debate about whether the words were sufficiently -

8     - you know, does it have to be one, you know, only one word

9     off or two words off.  If it has to do -- because if Your

10    Honor may recall, Mr. Galban's statement at that conference,

11    which we quoted and that Your Honor repeated in your opinion,

12    was a generalized discussion of the industry's approach to

13    the exclusion at large, even though there are variations of

14    it.

15          THE COURT:  The answer to your question is yes.

16          MR. BUCHMAN:  Yes.

17          THE COURT:  The answer to your question is yes.

18          MR. BUCHMAN: Okay.  And the only other bucket was,

19    Judge, whether in the files of Mr. Galban or otherwise, if

20    there is -- because it was as Ms. Davis noted, the bump-up

21    exclusions, the two that they actually crafted as their own

22    primary version, the '02 form which obviously predates many

23    of the years they were operating as an excess here, and then

24    the '12 form, if -- because it's limited to those two

25    exclusions, we would like documents regarding the drafting

1    history of those two exclusions, the Chubb primary or Federal

2    primary that they crafted, even if not in the files of Mr.

3    Galban.

4              THE COURT:  Okay.

5              MS. DAVIS:  To the extent that it exists, yes --

6              THE COURT:  Yes.

7              MS. DAVIS:  -- we can do that, but I will just note,

8    again, for the record that we do not -- I mean, we

9    respectfully, you know, continue to say that the industry at

10   large in what was being done in general is not relevant to

11   the interpretation of the language in this case.  And in

12   terms of what Mr. Buchman said about, you know, comparing one

13   phrase to another.  If you look at the five provisions that

14   are in the five policies issued to GDI and five types of

15   policies that Mr. Buchman has agreed to narrow his original

16   search to, those are different as well.  You know, so there

17   is going to be some interpretation.  There's not just one --

18   what he has asked for now is not just the one phrase from the

19   one policy which relates to this case, he's asked for all the

20   ones issued to GDI over a 10 year period.  So there will be

21   some give and take on that point, but again we disagree that

22   it's relevant, but we respectfully will comply with your

23   order.

24             THE COURT:  Okay.  Counsel are perfectly willing in

25   their right to disagree with me.  You know, if we weren't

1    dealing with an insurance policy drafted by the insurance

2    company when the law is that custom and usage under certain

3    circumstances come into play, and you certainly have to hear

4    evidence at trial in regard to -- in regard to that to see,

5    you know, whether or not and how far plaintiff can go in that

6    regard, I would ordinarily agree with you.  But because we're

7    only at the discovery stage and relevancy is the standard

8    now, I think you have to make it available.

9            MS. DAVIS:  Thank you, Your Honor, and we'll be sure

10   to remember that later in the case.

11           THE COURT:  Now, with respect to CNA and their

12   searching for their drafting history --

13           MR. BUCHMAN:  I can give you a little good news on

14   that front, Judge.

15           THE COURT:  Oh, I always want good news.

16           MR. BUCHMAN:  So Mr. Goodstein and I had a

17   conversation out in the hallway --

18           THE COURT:  Okay.

19           MR. BUCHMAN:  -- while we were waiting to come into

20   court and he gave me some additional detail.  Our concern

21   about the search process is because, you know, as Mr. -- CNA

22   argued in their June brief on category 1, there's at least

23   one of the bump-up exclusions that GDI had, the 5(b) reasons

24   they're called in the motion that CNA acknowledges was it's

25   own form, right?  We just had that discussion about Federal.

40

1    And so, we were curious as to why they were not finding

2    documents about their own form.  Mr. Goodstein had gave me

3    some additional detail in that regard out in the hallway.  I

4    have asked him and he has conceptually agreed, as I

5    understand it to provide from someone in-house at CNA a

6    certification -- describing what they did to search for a

7    drafting history, you know, in terms of document maintenance

8    protocols and what they did to search, and both in terms of

9    what they searched for and where they searched for it,

10   systems, physical repositories, et cetera.  Obviously it's

11   going to take him -- they're still not completely done with

12   the hard copy search, so he told me it might take a couple of

13   weeks to get that certification to me.  With Your Honor's

14   permission, I'd like to hold the issue with CNA in abeyance,

15   because as I told Mr. Goodstein in the hallway if I get the

16   certification and after -- having a chance to study it and

17   talk with my client about it, if it makes sense in terms of

18   reconciling it with the prior representation that it was

19   their form, we may be done.

20          THE COURT:  Well, tell me what order I should enter

21   on the record now, on the motion?

22          MR. BUCHMAN:  Could the -- you have -- we have the

23   two rulings on the motion as to Arch and Federal.  Can we

24   hold the motion in abeyance as to CNA pending receipt of the

25   certification --

1           THE COURT:  Okay.

2           MR. BUCHMAN:  -- and reporting back to the Court?

3           THE COURT:  All right.  So the motion was filed on

4    8/21?

5           MR. BUCHMAN:  Correct, Your Honor.

6           THE COURT:  Okay.  How much time would you need to

7    resolve the matter?

8           MR. GOODSTEIN:  How about -- I'm just thinking in my

9    head.  I know the Jewish holidays are coming up and I'm not

10   going to be around.  Is three weeks reasonable?

11          THE COURT:  Okay.

12          MR. BUCHMAN:  That works for us, Your Honor.

13          THE COURT:  Well, when is the close of fact

14   discovery?

15          MR. BUCHMAN:  December 18th, I believe.

16          THE COURT:  All right.  So today is the --

17          MR. BUCHMAN:  September 15th.

18          THE COURT:  Take until October 15th, okay?  You

19   know, I'm not -- but I have to get a letter from you because

20   I don't to keep an open motion on the file.

21          MR. BUCHMAN:  You need a letter from me reporting

22   back on the --

23          THE COURT:  On the docket so you have to let me

24   know.

25          MR. BUCHMAN:  So you want a letter from me by

1    October 15th?

2                THE COURT:  Yes.

3                MR. BUCHMAN:  Okay.  Just want to make sure I

4    understand the deadline.

5                THE COURT:  And let me know how -- the kind of order

6    I should enter on the docket --

7                MR. BUCHMAN:  Okay.

8                THE COURT:  -- on the motion in view of my rulings

9    and the withdrawal of certain -- you know, the agreement on

10   certain issues.  These things show up on lists so we try to

11   resolve motions.  All right?

12               MR. BUCHMAN:  Sure.  We will have a letter to you by

13   October 15th.

14               THE COURT:  Okay.

15               MS. DAVIS:  And Your Honor, if I may?

16               THE COURT:  Yes?

17               MS. DAVIS:  With respect to Federal, the subject of

18   our discussion here today is actually not part of Mr.

19   Buchman's motion to compel.  This was -- it was subsequent,

20   it was not briefed in the motion to compel.  We just received

21   -- you know, he and I were having discussions about this but

22   we just received the actual request.  So with respect to the

23   motion to compel we had resolved everything on that.  This is

24   a separate order.

25               THE COURT:  Okay.

1           MS. DAVIS:  So if we could just make it separate and

2    not -- we're not -- this is not a ruling against us as to a

3    motion to compel, it's --

4           THE COURT:  Okay.

5           MS. DAVIS:  -- your view on what we should do on the

6    current request in front of us.

7           THE COURT:  Do you need a specific order from me or

8    can you order the transcript and show it to your client?

9           MR. BUCHMAN:  I think like the July 5th transcript.

10          MS. DAVIS:  I think we're fine with that.

11          THE COURT:  Okay.

12          MR. BUCHMAN:  I think your comments were

13   sufficiently clear.

14          THE COURT:  All right.  Has this case -- have you

15   gone to magistrate judge for mediation?

16          MR. BUCHMAN:  We're actually due to see Magistrate

17   Judge Wells on January 8th?

18          MS. DAVIS:  10th, I think.

19          MR. BUCHMAN:  It's Wednesday, the 10th of January.

20          THE COURT:  Okay.  All right.  There's nothing else

21   then.  Anything, anyone want to put anything else on the

22   record?

23          MR. BUCHMAN:  That's it, Your Honor.

24          THE COURT:  Okay.  We'll stand in recess.

25          MR. BUCHMAN:  Thank you, Your Honor.

44

```
1              ALL:  Thank you, Your Honor.

2          (Court adjourned)

3

4                         CERTIFICATION
5   I certify that the foregoing is a correct transcript from the
6   electronic sound recording of the proceedings in the above-
7   entitled matter.
8
9
10                                            10/3/17
11
12  _____   _____
13  Signature of Transcriber                 Date
```